## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

------------------------------------------------x

KEVIN FRAZIER,

                Plaintiff,

        v.

BED, BATH AND BEYOND, INC. AND GARY
NEWTON, in his individual and professional
capacities,

                Defendants.

------------------------------------------------x

Civil Action No.:  2:10-cv-5398

(WJM)(MAS)

**STATEMENT OF MATERIAL FACTS
NOT IN DISPUTE PURSUANT TO
<u>LOCAL RULE 56.1</u>**

Pursuant to Local Rule 56.1(a), defendants Bed Bath and Beyond Inc. and Gary Newton ("Defendants"), by and through counsel, submit the following Statement of Material Facts Not in Dispute in support of their motion for summary judgment:[1]

### Background

1.      Plaintiff Kevin Frazier ("Frazier") began working for Defendant Bed Bath and Beyond Inc. ("BBB") on May 7, 2007 at its Union, New Jersey corporate office.  *See* Goldstein Decl., Ex. B (hereinafter, "Complaint"), ¶ 10.

2.      Frazier worked in BBB's Information Technology Department as a Database Administrator and was responsible for the Microsoft Sequel database servers.  *See* Complaint at ¶ 4; Goldstein Decl., Ex. A (hereinafter, "Frazier Dep.") at 59:16-19.[2]

3.      Frazier's manager was defendant Gary Newton ("Newton").  *See* Complaint, ¶ 11.

---

[1] This Statement of Material Facts Not in Dispute is based on (i) deposition testimony and exhibits annexed to the Declaration of Marvin M. Goldstein, dated September 7, 2012 ("Goldstein Decl."), (ii) the Declaration of Paul DePrima, dated September 6, 2012 ("DePrima Decl."), and (iii) the Declaration of David Rubin, dated May 7, 2012 ("Rubin Decl.").

[2] For purposes of this motion for summary judgment only, Defendants assume the truth of Frazier's deposition testimony.

4.      Newton's manager was David Ortiz ("Ortiz").  *See* Complaint, ¶ 11.

**Frazier Receives Two Emails Which He Thinks Are Funny**

5.      Lisa Del Rey ("Del Rey") is a Senior Wireless Analyst in BBB's Information Technology Department.  *See* Goldstein Decl., Ex. N (hereinafter, "Del Rey Dep."), 6:16-18.

6.      Del Rey was Frazier's co-worker and was not his supervisor.  *See* Frazier Dep. at 91:5-7.

7.      On August 11, 2008, Lisa Del Rey sent an e-mail to Frazier with the subject line "WHY-WHY-WHY!!!!" which contained several images of African Americans.  *See* Goldstein Decl., Ex. H; Frazier Dep. at 99:2-5.

8.      Del Rey did not believe that Frazier would be offended by the August 11, 2008 email because she "knew him" and "had a relationship with him."  *See* Del Rey Dep. at 27:20-28:5.

9.      Robert Aquilino, a co-worker of Frazier and Del Rey, testified that Frazier and Del Rey's relationship was "particularly friendly," that she and Frazier went out to lunch together "approximately once every other week," and that he, Frazier and Del Rey went on fifteen minute group walks around the facility "approximately three, four times a week."  See Goldstein Decl., Ex. S (hereinafter, "Aquilino Dep.") at 20:11-17, 20:25-21:2, 33:9-18.

10.     Frazier sent Del Rey two email responses to the August 11, 2008 email, which stated "I saw this one before, it's crazy" and "the funny one was uncle peaches..\aunt bob."  *See* Goldstein Decl., Exs. Y, Z.

11.     Frazier did not report his receipt of the August 11, 2008 email to his supervisor or to Human Resources until February 10, 2009, approximately six months after he received it.  *See* Frazier Dep. at 98:6-21.

2

12.     David Rubin ("Rubin") is the owner of Data Futures, an independent database consulting business located in or around Boca Raton, Florida.  *See* Goldstein Decl., Ex. R (hereinafter, "Rubin Dep.") at 5:8-23, 9:9-10; Rubin Decl., ¶ 1.

13.     Data Futures provides maintenance, administration, programming, on-call emergency support and general guidance to BBB relative to its Microsoft SQL servers and Oracle servers.  *See* Rubin Dep. at 6:7-20; Rubin Decl., ¶ 2.

14.     David Rubin has never been to BBB's corporate headquarters in Union, New Jersey or any other BBB location.  *See* Rubin Dep. at 9:12-17; Rubin Decl., ¶ 3.

15.     David Rubin has never met Frazier personally.  *See* Rubin Dep. at 9:23-25.

16.     On November 4, 2008, Rubin sent an email to Frazier with the subject line "Ghetto Spongebob," which contained a single image of a person, alleged by Frazier to be an African American.  *See* Goldstein Decl., Ex. I.

17.     Eight minutes after receiving the November 4, 2008 email, Frazier replied to Rubin, stating:  "lmao!!!"[3] *See* Goldstein Decl., Ex. AA.

18.     Frazier forwarded the Rubin email to his personal email account, referring to it as "email from contractor."  *See* Goldstein Decl., Ex. X.

19.     On November 5, 2008, Frazier forwarded the November 4, 2008 email to Ortiz, stating that at first he thought the e-mail was "funny," but now found it offensive.  *See* Goldstein Decl., Ex. I.

20.     Shortly after receiving Frazier's email, Ortiz responded to Frazier's November 5, 2008 email, stating that he would speak with Rubin about the inappropriateness of the email and instruct Rubin to stop sending e-mails of this nature to anyone at BBB.  *See* Goldstein Decl., Ex. I.

---

[3] LMAO is a common internet acronym for "Laughing My Ass Off."

21.     Ortiz called Rubin and told him that the email was "an issue" and that Rubin

needed to avoid sending any personal material to BBB employees.  *See* Rubin Dep. at 12:7-13:1.

22.     Rubin "apologized profusely" and indicated that he had sent the email to Frazier

accidentally.  *See* Goldstein Decl., Ex. I.

23.     Ortiz immediately emailed Frazier, explaining that Rubin had "apologized

profusely" for sending the email and that Rubin had "intended th[e] email to go to his sister

Karen and outlook found [Kevin Frazier's] name after he put in the letter 'K'."  *See* Goldstein

Decl., Ex. I.

24.     On February 10, 2009, more than three months after the November 4, 2008 email,

Frazier reported its receipt to BBB's Human Resources Department.  *See* Frazier Dep. at

97:13-98:15.

25.     On February 10, 2009, Frazier met with Denise DiPiano ("DiPiano"), a BBB

Human Resources manager, and told her that he had received an email from David Rubin on

November 4, 2008 which he found offensive.  *See* Goldstein Decl., Ex. M (hereinafter, "DiPiano

Dep.") at 37:6-13.

26.     During the February 10, 2009 meeting, DiPiano asked Frazier whether he had

received any other emails he found to be offensive.  *See* DiPiano Dep. at 54:17-23.

27.     Frazier showed DiPiano an August 11, 2008 email, but the name of the sender had

been torn off.  *See* DiPiano Dep. at 55:18-56:3.

28.     When DiPiano asked Frazier to tell her who had sent the email, Frazier wanted to

know "what would happen to th[e] person" and stated that "she was a nice person and that she

was with child."  *See* DiPiano Dep. at 56:22-57:6.

29.     On February 12, 2009, two days later, Frazier emailed DiPiano the August 11,

2008 email from Del Rey in its entirety.  *See* DiPiano Dep. at 58:2-4; Goldstein Decl., Ex. H.

4

30.     DiPiano met with Ortiz on February 10, 2009 to discuss Plaintiff's complaint regarding the Rubin email; Ortiz explained that he had spoken to Rubin about the e-mail the same day Frazier had complained, and that he had told Rubin not to send e-mails to BBB employees that were not business-related.  *See* DiPiano Dep. at 62:24-63:13.

31.     On February 16, 2009, DiPiano spoke to Del Rey concerning the August 11, 2008 email, advising her that the email was inappropriate and if she sent any more inappropriate emails she would face more severe discipline.  *See* DiPiano Dep. at 89:5-10, 90:12-23; Del Rey Dep. at 30:15-31:5.

## Frazier's On-Call Schedule Is Changed As A Cost-Cutting Measure

32.     Newton manages three teams of BBB database administrator employees:  the Oracle Team, the DB2 team and the SQL team.  *See* Goldstein Decl., Ex. O (hereinafter, "Newton Dep.") at 9:8-10:11.

33.     As a result of the economic downturn in late 2008, BBB was looking to reduce costs in every possible area.  *See* Newton Dep.  at 41:4-13.

34.     In order to reduce Data Futures consulting costs, Ortiz directed Newton that going forward, Frazier's on-call hours would be expanded, so that he would be on-call after hours and on the weekend.  *See* Newton Dep. at 40:24-41:3.

35.     On December 16, 2008, Newton informed Frazier of the change to his on-call schedule.  *See* Goldstein Decl., Ex. W.

36.     Previously, Frazier had been on an alternating on-call schedule with Data Futures. *See* Frazier Dep. at 120:19-23; Newton Dep. at 40:4-17.

37.     During a February 16, 2009 meeting with Newton and Ortiz, Frazier was informed that he was the primary DBA for SQL, that he would be expected to return phone calls within a reasonable amount of time, and that although management would try to avoid after

hours or weekend work, there will be times when such work is required.  *See* Goldstein Decl., Ex. K.

38.     The amount of after-hours and weekend support required by BBB from 2007 through 2009 relative to its SQL servers was approximately one (1) to two (2) hours per month. *See* Rubin Decl., ¶ 4.

39.     Rubin did not notice any material change in the amount of after-hours and weekend support required by BBB relative to its SQL servers from 2008 to 2009.  *See* Rubin Decl., ¶ 5.

40.     Frazier's predecessor, Jim Hill, had been on-call for all after hours and weekend support.  *See* Newton Dep. at 35:19-36:15, 39:1-12.

41.     Frazier's immediate replacement, Bong Kim, was on-call for all after hours and weekend support.  *See* Newton Dep. at 132:14-20.

42.     The Oracle team had several members who alternated being on-call after hours and weekends.  *See* Newton Dep. at 10:15-20, 43:3-16.

43.     The DB2 team had one member who was responsible for all after hours and weekend support.  *See* Newton Dep. at 132:1-13.

<u>**Frazier's SQL 2008 Training Class Is Cancelled By An Outside Vendor**</u>

44.     Frazier was asked by Ortiz to perform an SQL 2008 installation upgrade. *See* Frazier Dep. at 131:12-132:9.

45.     BBB enrolled Frazier in a training class relative to SQL server 2008 that was to be provided by an outside vendor.  *See* Frazier Dep. at 132:10-20.

46.     The vendor cancelled a number of the scheduled training sessions, and BBB told Frazier that it was going to find a different vendor for the training.  *See* Frazier Dep. at 132:21-133:14.

6

47.     Frazier was able to complete the SQL 2008 installation upgrade assignment without the training within the time allotted.  *See* Frazier Dep. at 132:6-9.

48.     On his 2009 performance review, Frazier was praised for his success completing the creation of SQL 2008 server environments "without any training or experience using SQL Server 2008."  *See* Goldstein Decl., Ex. L.

49.     On February 12, 2009, Frazier complained to DiPiano that he had been retaliated against by being asked to perform the SQL 2008 installation upgrade without having been provided training.  *See* DiPiano Dep. at 65:3-18.

50.     During a February 16, 2009 meeting with Newton and Ortiz, Frazier was informed that he would be given time to learn new products and would be given the proper tools to support those products before they entered production.  *See* Goldstein Decl., Ex. K.

51.     On February 21, 2009, Frazier filed a charge of discrimination with the EEOC alleging race discrimination.  *See* Goldstein Decl., Ex. J.

**Frazier's May 2009 Review and Termination**

52.     On May 8, 2008, Frazier received his first BBB annual performance review from Newton.  *See* Goldstein Decl., Ex. G.

53.     The 2008 Review was an "ME+" or "Meets Expectations+" Review.  *See* Goldstein Decl., Ex. G.

54.     On May 8, 2009, Frazier received his second BBB annual performance review (the "2009 Review") from Newton.  *See* Goldstein Decl., Ex. L.

55.     The 2009 Review was an "ME" or "Meets Expectations" Review.  *See* Goldstein Decl., Ex. L.

1990/12722-075 current/28373042v2

56.     During the May 8, 2009 review meeting, Frazier learned that he would be receiving a salary increase as a result of his overall rating in the 2009 Review.  *See* Frazier Dep. at 171:1-6.

57.     During the May 8, 2009 review meeting, Frazier refused to sign the 2009 Review. *See* Frazier Dep. at 167:15-18.

58.     During the May 8, 2009 review meeting, Frazier asked Newton "how can a man of faith be lying … on my review." *See* Newton Dep. at 84:14-85:12.

59.     During the May 8, 2009 review meeting, Frazier stood up, raised his voice, and said "You're a liar." *See* Newton Dep. at 85:21-86:1.

60.     During the May 8, 2009 review meeting, Frazier "ran out of the room." *See* Newton Dep. at 84:14-85:12.

61.     At approximately 8:30 a.m. on May 11, 2009, Newton spoke to Frazier and they agreed to continue discussing the 2009 Review.  *See* Newton Dep. at 113:5-6.

62.     At approximately 8:40 a.m. on May 11, 2009, Frazier came to Newton's cube, told Newton that he didn't want to continue the review and, in a very loud voice, repeatedly screamed that Newton was a liar.  *See* Newton Dep. at 114:2-15, 115:12-22.

63.     Noren Shah, an employee of BBB's Information Technology department who worked in the same cluster of cubicles as Frazier and Newton, saw Frazier stand in the middle of the room and heard him scream in the direction of Newton's desk.  *See* Goldstein Decl., Ex. T at 11:16-12:13-15.

64.     Connie Van Dyke is BBB's Vice President of Human Resources ("Van Dyke"). *See* Goldstein Decl., Ex. P (hereinafter, "Van Dyke Dep.") at 5:8-12.

1990/12722-075 current/28373042v2

65.     After learning of Frazier's May 8 and May 11 conduct from Newton, DePrima consulted with Van Dyke and they decided that DePrima should have a meeting with Frazier and Newton to discuss what had occurred. *See* Van Dyke Dep. at 21:10-17.

66.     DePrima and Van Dyke decided that if Frazier admitted to the conduct reported by Newton, he would be terminated. *See* Van Dyke Dep. at 21:18-20.

67.     During the May 11, 2009 meeting, Frazier admitted that he had said to Newton that Newton had lied on the review and that he had refused to complete the review. *See* DePrima Dep. at 65:21-66:6.

68.     On May 11, 2009, Frazier was terminated during a meeting with Gary Newton and Paul DePrima ("DePrima"), BBB's Director of Corporate Human Resources. *See* Frazier Dep. at 169:8-9.

69.     Frazier was terminated because of his behavior on May 8, 2009 and May 11, 2009, namely calling Newton a liar and refusing to finish his 2009 Review. *See* DePrima Dep. at 62:3-9; DePrima Decl., ¶ 6.

70.     During the May 11, 2009 meeting, Frazier took notes on the back of DePrima's business card after asking DePrima the reason for his termination. *See* DePrima Dep. at 62:14-25, 63:11-16.

71.     Frazier took the business card with him when he left the May 11, 2009 termination meeting. *See* DePrima Dep. at 73:24-74:2.

72.     Frazier admitted that he knew he was going to be fired before the May 11, 2009 meeting because he had already taken several of his personal possessions home. *See* DePrima Dep. at 43:4-9.

9

**Frazier Creates A Forgery Of The Rubin Email**

73.     On September 3, 2009, Frazier's attorney, Thomas McKinney, Esq., sent a

demand letter to BBB.  *See* Goldstein Decl., Ex. E.

74.     The September 3, 2009 demand letter stated that Frazier had received an email

from a co-worker with the caption "DEAD NiGGa" and referenced the November 4, 2008 Rubin

email.  *See* Goldstein Decl., Ex. E.

75.     The November 4, 2008 email sent to Frazier by Rubin did not contain the words

"DEAD NiGGa."  *See* Goldstein Decl., Ex. I.

76.     On August 24, 2009, Frazier sent Thomas McKinney a forgery of the

November 4, 2008 email to which term "DEAD NiGGa" had been added.  *See* Goldstein Decl.,

Ex. V.

77.     Frazier testified (i) that he was "not sure how th[e] caption [DEAD NiGGa] got

there," (ii) that he forwarded the email for "safekeeping" to his "mother … aunt … cousin [and]

some friends," (iii) that when McKinney "asked for [the email,] [Frazier] did not have a

copy …," (iv) that "when [one of the people he sent the email to for safekeeping] forwarded it

back to [him] that's when [he] noticed that it had that caption on it," and (v) that he forwarded it

to Thomas McKinney anyway.  *See* Frazier Dep. at 22:7-32:10.

78.     In discovery, Frazier did not produce any emails demonstrating his purported

transmission of the Rubin email to his family members and/or friends.

**Frazier Lied On His Interrogatory Responses to Conceal His Prior EEOC Charges**

79.     Defendants served Frazier with Interrogatories on or about May 2, 2011.  *See*

Goldstein Decl., Ex. C.

80.     Interrogatory No. 6 of Defendants' May 2, 2011 Interrogatories requested that

Frazier "identify any civil or criminal action, lawsuit, charge, arbitration or other proceeding in

which Plaintiff has been a plaintiff, defendant or other party since January 1, 2000." *See* Goldstein Decl., Ex. C, p. 8.

81.     In his certified responses dated June 24, 2011, Frazier responded to Interrogatory No. 6 of Defendants' May 2, 2011 Interrogatories by stating: "Without waiving this objection, Plaintiff has not been a party to any other criminal or civil action or legal proceeding." *See* Goldstein Decl., Ex. D, p. 4-5.

82.     On July 23, 2007, Frazier filed an EEOC Charge of Discrimination against Sterling Testing Systems, a former employer, alleging discrimination. *See* Goldstein Decl., Ex. F.

83.     On January 25, 2011, Frazier filed an EEOC Charge of Discrimination against Fusionstorm, a subsequent employer, alleging discrimination and retaliation. *See* Goldstein Decl., Ex. U.

Respectfully Submitted,

PROSKAUER ROSE LLP

Dated: September 7, 2012

By:   s/ Marvin M. Goldstein
Marvin M. Goldstein

One Newark Center
Newark, NJ 07102
(973) 274-3200
*Fax* (973) 274-3299

*Attorneys for Defendants*
*Bed, Bath & Beyond, Inc. and Gary Newton*

11