# Exhibit P

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF NEW JERSEY

3   CIVIL ACTION NO. 2:10-CV-5398  COPY

4  KEVIN FRAZIER,       :

5    Plaintiff,    :

6  vs.       : CIVIL ACTION

7  BED BATH AND BEYOND INC., and :

8  GARY NEWTON, in his individual:

9  and professional capacities, :

10    Defendants.   :

11  Computer-aided transcript of deposition

12  testimony of CONNIE VAN DYKE, taken

13  stenographically in the above-entitled matter

14  before CANDACE J. GREEN, a Certified Court

15  Reporter and Notary Public of the State of New

16  Jersey, at the Law Offices of PROSKAUER ROSE,

17  LLP, One Newark Center, 18th floor, Newark, New

18  Jersey, taken on Wednesday, December 14, 2011,

19  commencing at 2:35 p.m.

20   GUY J. RENZI & ASSOCIATES

21  CERTIFIED COURT REPORTERS & VIDEOGRAPHERS

22   GOLDEN CREST CORPORATE CENTER

23  2277 STATE HIGHWAY #33, SUITE 410

24   TRENTON, NEW JERSEY 08690

25  TEL: (609) 989-9199  TOLL FREE: (800) 368-7652

2

1  A P P E A R A N C E S :
2
3  ZATUCHNI & ASSOCIATES LLC
4  BY: DAVID ZATUCHNI, ESQ.
5     287 South Main Street
6     Route 29
7     Lambertville, New Jersey 08530
8     Tel: (609) 243-0300
9     E-mail: davidz@zatuchniassociates.com
10  Attorneys for Plaintiff.
11
12
13  PROSKAUER ROSE, LLP
14  BY: MARVIN M. GOLDSTEIN, ESQ.
15     One Newark Center
16     18th Floor
17     Newark, New Jersey 07102-5211
18     Tel: (973) 274-3200
19     E-mail: mmgoldstein@proskauer.com
20  Attorneys for Defendants.
21
22  A L S O   P R E S E N T :
23  PAUL DePRIMA
24  MICHAEL H. WILCK
25

3

1            I N D E X
2
3  WITNESS                    PAGE
4  CONNIE VAN DYKE
5     Examination By Mr. Zatuchni   5
6
7
8         E X H I B I T S
9
10  ID      DESCRIPTION        PAGE
11  VanDyke-1   Letter from Suojanen   25
12          to EEOC  4/6/09
13
14     (EXHIBITS NOT ANNEXED HERETO)
15
16
17
18
19
20
21
22
23
24
25

4

1  LITIGATION SUPPORT PAGE
2
3
4  DIRECTION TO WITNESS NOT TO ANSWER
5  Page   Line   Page   Line
6       (None)
7
8  REQUEST FOR PRODUCTION OF DOCUMENTS
9  Page   Line   Page   Line
10       (None)
11
12
13
14  INFORMATION TO BE FURNISHED
15  Page   Line   Page   Line
16       (None)
17
18
19  QUESTIONS MARKED FOR A RULING
20  Page   Line   Page   Line
21       (None)
22
23
24
25

5

1  C O N N I E   V A N   D Y K E ,
2     650 Liberty Avenue, Union, New Jersey
3     07083, having been first duly sworn, was
4     examined and testified as follows:
5  EXAMINATION BY MR. ZATUCHNI:
6     Q.    Good afternoon, Ms. VanDyke.
7     A.    How are you?
8     Q.    My name is David Zatuchni.  I'm
9  Kevin Frazier's attorney in his lawsuit against
10  Bed Bath & Beyond.  You're the vice-president
11  for Human Resources of Bed Bath & Beyond?
12     A.    Yes, I am.
13     Q.    And how long have you held that
14  position?
15     A.    Since 1996, 16 years.
16     Q.    You were named as a potential
17  witness in this case, as a person with
18  knowledge by Bed Bath & Beyond, BB&B.
19         MR. GOLDSTEIN: Don't call it Linens
20  'N Things.
21     Q.    And that's why I called you in for
22  this deposition.  Did you play a role in Kevin
23  Frazier's termination in any way?
24     A.    Yes.
25     Q.    You did.  So you've been the

18

1    Q.    Now, at this point you were aware
2  that Mr. Frazier had made an EEOC charge of
3  retaliation against Bed Bath & Beyond and
4  particularly, specifically, his managers, Gary
5  Newton and David Ortiz.
6    A.    I'm aware of every EEO case that's
7  filed against the company.
8    Q.    You did know that.
9    A.    Uh-huh.
10       MR. GOLDSTEIN: Yes?
11   A.    Yes.
12   Q.    Did Paul DePrima come to you before
13  you learned of the charge and tell you that Mr.
14  Frazier had complained about retaliation to
15  Human Resources internally in February of '09?
16   A.    I don't remember. I don't have any
17  recollection. Sorry.
18   Q.    Okay. So the first time that you
19  knew of any kind of complaint of retaliation by
20  Mr. Frazier was only once when you received the
21  EEOC charge.
22   A.    Yes.
23   Q.    If Mr. DePrima knew of a prior
24  complaint of retaliation, internal complaint,
25  is that something Mr. DePrima should have

19

1  brought to your attention?
2    A.    Yes, and by me not remembering, it
3  doesn't mean he did. It just means I don't
4  remember.
5    Q.    Is that the kind of thing you would
6  not remember?
7    A.    Possible. I have 44,000
8  associates, so depending on the resolution of
9  an issue, I might not remember it.
10   Q.    As you sit here now, you don't have
11  any independent recollection that you knew of
12  internal complaints before you received the
13  EEOC charge?
14   A.    No.
15   Q.    Were you about to say something?
16   A.    No, that's all right.
17   Q.    If Mr. DePrima was going to tell
18  you about that or does Mr. DePrima communicate
19  with you by email?
20   A.    On certain issues. These issues he
21  would be talking to me about, these types of
22  issues.
23   Q.    So you're saying that if Mr.
24  DePrima was going to communicate to you about
25  any internal complaint by an associate, within

20

1  the corporate offices, of retaliation, that
2  might only be in the form of a verbal
3  conversation and it might not be documented
4  anywhere.
5    A.    That's right.
6    Q.    Okay. So if you don't remember the
7  conversation, then there's no way to know
8  whether that conversation occurred or not?
9    A.    True.
10   Q.    After you received the charge of
11  discrimination, did you ask Mr. Frazier about
12  Mr. Frazier? Did you say: "Did this guy ever
13  come to Human Resources before he came to the
14  EEOC?"
15   A.    I really don't remember having a
16  specific conversation about it because I don't
17  write the position statements, so I don't
18  remember.
19   Q.    But apart from writing the position
20  statements, wouldn't you be at least curious to
21  know whether there was an internal complaint
22  that went to Human Resources before an employee
23  made a charge with the EEOC?
24   A.    I would, yes.
25   Q.    Do you have any specific

21

1  recollection of something that --
2    A.    I don't remember.
3    Q.    Prior to Mr. DePrima coming to you
4  that first time after the charge to talk about
5  preparing a position statement for him, did
6  anybody else come to you before that with
7  respect to any issues relating to Mr. Frazier,
8  as far as you can recall now?
9    A.    Not that I can recall.
10   Q.    Okay. Let's go back then to May
11  11th, that Monday. So you guys decided to have
12  -- when I say "you guys," you and Mr. DePrima
13  decided to have Mr. DePrima meet with Mr.
14  Newton and Mr. Frazier to determine whether Mr.
15  Frazier admitted doing the things he was
16  accused of?
17   A.    Yes.
18   Q.    If he did admit, then he would be
19  terminated.
20   A.    That's right.
21   Q.    Okay. Is there any discussion with
22  David -- did you have any discussions with
23  David Ortiz on Friday or Monday?
24   A.    Paul would have had conversations
25  with him.

# Exhibit Q

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF NEW JERSEY

3              CIVIL ACTION NO.:  2:10-CV-5398

4    KEVIN FRAZIER,                    :

5          Plaintiff,                  :

6          -v-                         :      CIVIL ACTION

7    BED BATH & BEYOND, BED BATH & :

8    BEYOND, INC. and GARY NEWTON, :

9          Defendants.                 :

10   ----------------------------x

11        Computer-aided transcript of the deposition

12   testimony of PAUL DEPRIMA taken stenographically in the

13   above-entitled matter before JACQUELINE MATHEWSON, a

14   Certified Court Reporter, License No. XI01404, and

15   Notary Public of the State of New Jersey, at the Law

16   Offices of PROSKAUER ROSE, LLP, One Newark Center,

17   Newark, New Jersey 07102 on Thursday, December 15,

18   2011, commencing at 10:48 a.m.

19           GUY J. RENZI & ASSOCIATES

20      CERTIFIED COURT REPORTERS & VIDEOGRAPHERS

21         GOLDEN CREST CORPORATE CENTER

22      2277 STATE HIGHWAY #33, SUITE 410

23         TRENTON, NEW JERSEY 08690

24   TEL: (609) 989-9199   TOLL FREE: (800) 368-7652

25           www.renziassociates.com



2

1   A P P E A R A N C E S :
2   ZATUCHNI & ASSOCIATES, LLC
3   BY:  DAVID ZATUCHNI, ESQ.
4       287 South Main Street - Route 29
5       Lambertville, New Jersey 08530
6       Tel: (609) 243-0300
7       E-mail: dzatuchniassociates.com
8   Attorneys for the Plaintiff.

10   PROSKAUER ROSE, LLP
11   BY:  MARVIN M. GOLDSTEIN, ESQ.
12       One Newark Center, 18th Floor
13       Newark, New Jersey 07102
14       Tel: (973) 274-3200
15       E-mail: mmgoldstein@proskauer.com
16   Attorneys for the Defendants Bed Bath
17   & Beyond and Gary Newton.

19   BED BATH & BEYOND
20   BY: MICHAEL H. WILCK, ESQ.
21       650 Liberty Avenue
22       Union, New Jersey 07063
23       Tel: (908) 688-0888
24       E-mail: michael.wilck@bedbath.com
25   Bed Bath & Beyond Corporate Attorney.

3

1                I N D E X
2
3   WITNESS                        PAGE
4   PAUL DEPRIMA
5     Examination by Mr. Zatuchni        4
6     Examination by Mr. Goldstein       73
7
8            E X H I B I T S
9
10   NO.        DESCRIPTION        PAGE
11   DePrima 1   Set of P. DePrima handwritten notes,
12             Bates BBB823- 855       26
13
14       (EXHIBITS NOT ANNEXED HERETO)
15
16          R E Q U E S T S
17
18       (NO FORMAL REQUESTS WERE MADE.)
19
20
21
22
23
24
25

4

1       P A U L   D E P R I M A, 6 Brownstone Terrace,
2   Hawthorne, New Jersey 07506, having been duly sworn,
3   testified as follows:
4   DIRECT EXAMINATION BY MR. ZATUCHNI:
5       Q.  Good morning, Mr. DePrima.
6       A.  Morning.
7       Q.  I apologize for the delay in getting your
8   deposition started today.
9       A.  It's okay.
10       Q.  As you know my name is David Zatuchni, and
11   for the record, I'm Kevin Frazier's attorney, and we're
12   taking your deposition today as part of this lawsuit.
13          I know you've sat in all the depositions in
14   this case and you have had the benefit of hearing what
15   everybody else had to say.
16          Have you yourself ever been deposed before?
17       A.  Yes, I have.
18       Q.  On how many separate occasions?
19       A.  Two times, maybe.
20       Q.  You know what the process is. I will be
21   asking you questions, your obligation is to answer my
22   questions as truthfully and completely as you can.
23          You are under oath.
24          If you don't understand one of my questions,
25   please let me know and I'll rephrase it, I'll restate

5

1   it.  Otherwise, we assume for the record that you
2   understood my question.
3          Kindly make sure that your responses are
4   verbal, the court reporter can't take down nods, shrugs
5   or uhms.  We'll try to avoid talking over each other
6   because the court reporter can only take down one
7   person talking at a time.
8          If you need a break at any time, please just
9   let me know, it's not a problem.  It's not supposed to
10   be a marathon.  As long as it's not in the middle of
11   one of my questions or in the middle of one of your
12   answers.
13          If there's any objections to my questions, I
14   might change my questions, I might go ahead and ask you
15   to answer it, in any event.  Obviously, if you're
16   instructed by your attorney not to answer a question,
17   then follow your attorney's directives.
18          You're still currently employed by Bed Bath &
19   Beyond?
20       A.  Correct.
21       Q.  What's your formal title now?
22       A.  Director of Corporate Human Resources.
23       Q.  How long have you been employed by Bed Bath &
24   Beyond all together?
25       A.  Since April of 2001.

**42**

1    Kevin responded, How can Gary rate me an EE
2  last year and an ME or Meets Expectations this year?
3    I responded, That wasn't true, because last
4  year his overall rating was a Meets Expectations, same
5  as this year.  And, yes, there may have been some
6  categories that were less -- that were twice, that were
7  less than last year, but last year's review was Kevin
8  Frazier's first review and Merton's curve taken into
9  account.
10    Now review is more objective and based upon
11  task-projects assigned.
12    I told Kevin this is another example of how
13  he misinterprets things.
14    Kevin blurted out, Did I misinterpret a
15  Director using a curse word?
16    I told Kevin that we weren't -- should be
17  here discussing that issue right now, but rather his
18  review, which is a Meets Expectations with an increase,
19  unfortunately, not seeing it that way.
20    Prepare to separate employment effective
21  immediately.  Offered Kevin Frazier the opportunity to
22  resign if he would like his record to reflect as such.
23    Kevin responded, I'm not leaving, you'll need
24  to fire me.
25    I said, Okay, you're fired.

**43**

1    Kevin asked the reason.
2    I responded, Lost faith in your ability to
3  represent Bed Bath & Beyond.
4    While Gary Newton and Marissa Farrell went to
5  Kevin Frazier's cube to collect his immediate personal
6  property.  Kevin mentioned that he had taken some of
7  his personal books home.
8    I asked why he had done this?
9    Kevin responded, I knew this was coming.
10  Q.  When did you write this?
11  A.  Immediately thereafter.
12  Q.  Like how much time between the meeting and
13  the time that you wrote this?
14  A.  I escorted Kevin out. And I went back to my
15  office and wrote my notes.
16  Q.  Okay.
17    So immediately thereafter you're saying?
18  A.  Oh, yeah.
19  Q.  Can you turn the page to 855?
20  A.  Sure.
21  Q.  Can you read that into the record, please.
22  A.  Sure.
23    It's regarding Kevin Frazier, May 27, 2009.
24    Kevin Frazier called today.
25    I told Kevin that I received the laptop and

**44**

1  other items, and thanked him for it. I meant to call
2  him but hadn't gotten around to it.
3    Kevin asked to know his date of termination.
4    I replied that it was his last day of work.
5    Kevin asked when that was.
6    I looked in ADP.  I told Kevin that it was
7  5/11. I heard Kevin Frazier write it.
8    Kevin then asked what was the reason for his
9  termination?
10    I told Kevin that I had given that to him on
11  5/11, and that Kevin had written it down.
12    Kevin Frazier asked for it again.
13    I told Kevin that I didn't mind helping him
14  with the day of termination, but anything else, he
15  would need to put his request in writing for me to
16  determine if we would respond.
17    Kevin then hung up the phone.
18  Q.  Okay.
19    The date of this conversa --
20    The date of the note is 5/27/09?
21  A.  That is the date of the call.
22  Q.  And that's the date that you wrote this note?
23  A.  Yes, it is.
24  Q.  If you can take a look at your notes from
25  5/11, on the first page of that note, which is 851.  I

**45**

1  just want to make sure that I have this right.
2    The first thing that you wrote is, "I
3  acknowledge that I was aware of KF's conversations with
4  GN on Friday and this morning", right?
5  A.  Right.
6  Q.  Then immediately after that you told Kevin,
7  "I told Kevin based on his comment that he shared with
8  GN on Friday during his review that this wasn't the
9  place for him. It's obvious he's not happy here with
10  us".
11    Did you say that to him?
12    Did you say at this point at the beginning of
13  the meeting that this wasn't the place for him?
14  A.  I acknowledged that he expressed his
15  displeasure with Bed Bath & Beyond.
16  Q.  Did you say to him --
17    This is your note, right?
18  A.  Yes.
19  Q.  "I told KF, based on his comment he shared
20  with GN on Friday during his review, that this wasn't
21  the place for him."  Did you say that to him?
22  A.  Yes.
23  Q.  Apart from acknowledging that you were aware
24  of his conversation with GN, that's the very first
25  thing you said to him that day, according to your own

62

1  EEOC Charge?
2      A.  Absolutely.
3      Q.  It's you are assertion the fact Mr. Frazier
4  had complained internally about retaliation and had a
5  complaint to the EEOC about retaliation, played no roll
6  whatsoever to terminate him?
7      A.  Decision to terminate Mr. Kevin Frazier was
8  based upon his behavior on May 8th and May 11th. Has
9  nothing to do with his EEOC Charge.
10     Q.  And you're saying that that decision was
11 actually made by you on May 11th during the meeting,
12 not before the meeting?
13     A.  Based upon his response, yes.
14     Q.  Was Mr. Frazier taking notes during this May
15 11th meeting?
16     A.  Yes, he did.
17     Q.  He had a pad and paper with him?
18     A.  No. He did not.
19     Q.  Did he ask for some?
20     A.  No.  He did not.
21     Q.  You provided him with a pad or paper?
22     A.  No.  I did not.
23     Q.  So how was he taking notes?
24     A.  He wrote something on the back of my business
25 card.

63

1      Q.  I see.
2         So he had a business card and he wrote
3  something on that.
4      A.  I typically give business cards to any
5  associate that's leaving the organization so that they
6  have a contact if they have any questions.
7      Q.  This is something you gave him at the
8  conclusion of the meeting then or at the beginning?
9      A.  At some point during the meeting.  I can't
10 remember when.
11     Q.  Do you know what he wrote on the card?
12     A.  No.
13     Q.  Do you know what was being said at the time
14 he wrote on the card?
15     A.  It was when he asked me why he was being
16 fired.
17     THE WITNESS:  Am I allowed to speak to
18 counsel?
19     MR. ZATUCHNI:  Sure. If you want to.
20     (Discussion held off the record.)
21     Q.  Do you want to change or add something to one
22 of your answers?  Did something pop into your head?
23     A.  No.
24     Q.  Is there something you want to tell me or do
25 you have a question for me about one of my questions?

64

1      A.  No. It's not a question. It's more of a
2  statement.
3      MR. GOLDSTEIN: Off the record.
4      (Discussion held off the record.)
5      MR. ZATUCHNI: He wanted to make a speech.
6      Back on the record.
7  BY MR. ZATUCHNI:
8      Q.  During this meeting on May 11th, did you ask
9  Kevin Frazier what the lies were or what the alleged
10 lies were on his review?
11     A.  Kevin stated that he felt Gary's ratings
12 below meets expectation were lies. That they should be
13 significantly exceeds or exceeds expectations.
14     Q.  Did you say or did you ask him, what is it
15 about your review that's an lie?
16     A.  He was objecting to --
17     Q.  My question was, what did you ask him?  Did
18 you ask him about --
19        Did you ask him for specific information?
20     A.  No. I did not go line by line with his review
21 to ask him what he specifically objected to.
22     Q.  But he told you that the ratings that he
23 received were lies?
24     A.  I believe he said that Gary was a liar or was
25 lying on his review.

65

1      Q.  In giving him certain ratings, I assume
2  that's what we're talking about?
3      A.  In Kevin's eyes the review, it was not
4  accurate.
5      Q.  Well, it was untruthful, right?  That's what
6  he thought.
7      A.  Yes. Sorry.
8      Q.  If Mr. --
9         Is it the use of the term liar that caused
10 you to terminate him, both with Gary and during that
11 meeting?
12        Is it the use of that word or him suggesting
13 that the -- strike that.
14        Was it the use of the word that you objected
15 to that you think made his termination legitimate?
16     A.  He was being disrespectful and unprofessional
17 to his manager by using the word, you're a liar
18 multiple times on May 8th and May 11th. May 11th being
19 on the floor of the office in front of other co-workers
20 and peers of Gary.
21     Q.  But he denied that he told Gary, you're a
22 liar, right?
23     A.  He denied using the word liar, but he agreed
24 to saying that Gary was lying.
25     Q.  On the review?

66

1    A.   On the review.
2        Those were the words he used, lying, Gary,
3  not you're a liar, Gary.
4    Q.   He told Gary you're lying on my review,
5  that's what he said?
6    A.   Right. Both on May 8th and May 11th.
7    Q.   And you're saying by him saying that was a
8  basis to terminate him?
9    A.   It was his conduct on May 8th and May 11th.
10 Lying was a component of it.  The use of the word lying
11 is a component of it.
12   Q.   Let me put it this way.
13       Do you think that disagreeing with the review
14 is a basis to terminate somebody?
15   A.   Absolutely not.
16   Q.   It wasn't just the fact that he was
17 disagreeing with it, right?  It was --
18   A.   -- the way he went about it. It was
19 unprofessional.
20   Q.   So by him you're saying, "You're lying" on
21 his review was disrespectful?
22   A.   He did it on the floor in his department in
23 front of his co-workers, Gary's direct reports, peers
24 of Gary.
25   Q.   How do you know that?

67

1    A.   Gary told me.
2        In fact, we got calls that there was a
3  commotion going on in IT West.
4    Q.   When did you get the call?
5    A.   I got the call shortly after Gary called me
6  to tell me what happened.
7    Q.   What day was that?
8    A.   That was on May 11th.
9    Q.   Was it May 11th or May 8th?
10   A.   May 11th.
11   Q.   So you didn't get calls on May 8th that there
12 was a commotion, you got calls that there was commotion
13 on May 11th, correct?
14   A.   Correct.
15   Q.   And who did you get calls form?
16   A.   I didn't get the call.  Calls came into the
17 Human Resources.
18   Q.   Do you know who called?
19   A.   No.  I do not.  I don't recall to be honest
20 with you.
21   Q.   Do you know who got the call?
22   A.   Someone in the HR. I don't know.
23   Q.   So let's go about it again.
24       Do you know what was said in the call?
25   A.   Just said that there was an outburst, a kind

68

1  of commotion.
2    Q.   Anything else besides that?
3    A.   No.
4    Q.   So you were saying his conduct was the reason
5  why he was terminated and that included telling Gary
6  that Gary was lying on his review?
7    A.   Yes.
8    Q.   And you're saying that it's the use of the
9  word lying that's disrespectful?
10   A.   Sure.
11   Q.   What if he said your review was retaliatory?
12       MR. GOLDSTEIN: Objection.  Calls for
13 something.
14   Q.   How is that any different, Mr. DePrima?
15       If he told Gary, Your review is false. Take
16 my hypothetical. He told Gary, Your review is false.
17 And the ratings that you have gave me on the review are
18 retaliatory.  And you've given me those ratings because
19 I made a complaint to the EEOC.
20       If he said that, would that be a basis to
21 terminate him?
22   A.   No.
23   Q.   Why not?
24   A.   Because his tone and where he made those
25 accusations.

69

1    Q.   Oh, so it's not him saying, You're lying,
2  right?  It's the tone he used and where he said it now;
3  is that what your testimony is?
4    A.   It was his actions and his words and his
5  conduct on May 8th and May 11th.
6    Q.   Okay.
7        If he said what I just said, your evaluation
8  is false and retaliatory, you would not have terminated
9  Mr. -- you're saying if he said that?
10   A.   You're saying that fairly calm. Kevin did not
11 say what he said calmly.  And he said it in an open
12 space, a work place.  Not in a closed conference room
13 one-on-one.
14   Q.   Let's really kind of go through this then.
15       You're saying -- you're saying -- strike
16 that.
17       What if Mr. Frazier was calm and they were in
18 a conference room and he said, You're lying on this
19 evaluation. This evaluation is full of lies.  He said
20 it calmly and in an enclosed space in a conference
21 room, would you have terminated Mr. Frazier at that
22 point?
23       MR. GOLDSTEIN: Objection.  Calls for
24 speculation. Partial facts.
25       Are we talking about the same scenario where

70

1    he picks up and walks out and refuses to sign it?  Or
2    are we talking about just those words being said?
3           I object to the form of the question.
4           Answer it if you can answer it.  But I think
5    the question is absolutely inappropriate.
6      Q.  Go ahead, you can answer my question.
7           If Mr. Frazier had told Mr. Newton that his
8    evaluation was full of lies, but said that calmly and
9    said it in a conference room where nobody else could
10   hear, would you have terminated Mr. Frazier?
11     A.  No.
12     Q.  So you're saying what caused you to terminate
13   him is the fact that he said those things, and he said
14   it loudly and in an open space where other people could
15   hear?
16     A.  It was his behavior.
17     Q.  When you say, "his behavior", do you mean
18   saying those things, saying it loudly and saying it in
19   an open space?
20     A.  Yes. And saying it in front of other
21   employees?
22     Q.  You didn't talk to any other employees before
23   you terminated Mr. Frazier, right?
24     A.  Spoke to Gary Newton.
25     Q.  Besides Mr. Newton.

71

1           You didn't talk to any third-party employees,
2    any other employees, right?
3           Mr. Frazier was talking to Gary Newton. You
4    didn't talk to anybody that overheard the conversation?
5      A.  No.
6      Q.  It was Gary Newton that told you that Mr.
7    Frazier had raised his voice and acted loudly?
8      A.  On which day?
9      Q.  On either one of those days.
10     A.  Yes. Both days.
11     Q.  No other employee told you that before you
12   terminated Mr. Frazier, correct?
13     A.  That is correct.
14     Q.  So your information about Mr. Frazier's
15   behavior came solely from Mr. Newton and no other
16   source?
17     A.  Kevin said he used those words still.
18     Q.  Besides what you claim Mr. Frazier told you,
19   no other employees told you what had transpired?
20     A.  I don't believe so.
21     Q.  Do you claim that Mr. Frazier also admitted
22   to raising his voice and yelling?
23     A.  Yeah. He said he was upset with the review on
24   both days.
25     Q.  When he said, You're lying on this review,

72

1    that he was yelling out loud in front of other people,
2    did Mr. Frazier admit that to you as well?
3      A.  I don't recall.
4      Q.  He did not admit that to you, correct?
5      A.  I didn't say that. I said I don't recall.
6      Q.  I assume that if he said that to you, that
7    would have been something that you would have noted in
8    your notes?
9           If Mr. Frazier said, yes, I told him that he
10   was lying, and I admit that I did so loudly in front of
11   other people, you would have probably noted that in
12   your notes, correct?
13     A.  Yeah. That could be.
14     Q.  The fact that it's not in your notes, the
15   probability is that it never occurred, right?
16     A.  No.  You're asking me to speculate here.
17     Q.  They're your notes and you were at the
18   meeting.  So I'm asking you, the fact that there's no
19   notation in your notes that Mr. Frazier conceded or
20   admitted that he spoke inappropriately in a loud voice
21   in front of other people to Mr. Newton, that would
22   probably indicate that that's not something that Mr.
23   Frazier told you?
24     A.  There is that possibility.
25     Q.  Did you have any qualms about terminating an

73

1    employee who had recently filed an EEOC Charge simply
2    based on Mr. Newton's word that Mr. Frazier had acted
3    loudly, spoken too loudly in front of other employees?
4      A.  No.
5           MR. ZATUCHNI: I don't have any other
6    questions.
7           MR. GOLDSTEIN: Couple of follow-ups.
8    CROSS-EXAMINATION BY MR. GOLDSTEIN:
9      Q.  I'm directing your attention to what's been
10   marked DePrima 1. I'll ask you to direct your attention
11   to the very last page, which is Bates stamped 855. I
12   direct your attention to the middle of the second
13   paragraph where you write, "KF then asked what was the
14   reason for his termination."
15          You then wrote, I told KF that I had given
16   that to him on 5/11 and KF had written it down.
17          Does that refresh your recollection as to
18   when you handed him the card on which he wrote the
19   information there?
20     A.  Yes, I do.
21     Q.  What is your recollection?
22     A.  That I had given him my business card prior
23   to him asking for the reason for the termination.
24     Q.  Do you recall what he did with that business
25   card after he wrote on the back of it?

74

1    A.  I can't tell you if he put it in his jacket
2  pocket or pants pocket, but he left my office with it.
3    Q.  And when he wrote down the reason that you
4  told him why he was being fired, did you take any
5  objection to him writing it down?
6    A.  No.
7    Q.  Directing your attention to the incident
8  about which you testified involving Reid Kolowski.
9        During any of the meetings at any time
10  concerning the Kolowski situation, did you have any
11  discussions with Mr. Frazier?
12    A.  Yes.
13    Q.  At any time during any of the discussions,
14  did Mr. Frazier ever allege that Mr. Kolowski used any
15  ratial epithets?
16    A.  No.
17    Q.  Lastly, if I could address you attention to
18  your notes of May 11, 2009. Page BBB slash 851. I
19  direct your attention to the second paragraph that
20  starts with, "I told KF that based on his comment that
21  he had shared with GN on Friday during his review, that
22  this wasn't the place for him."
23        Isn't it your testimony that in that
24  paragraph that you were recording what you told Mr.
25  Frazier or what Mr. Frazier had told Gary Newton?

75

1        Strike that.
2        The sentence says, "I told KF that based on
3  his comment that he shared with GN on Friday", and you
4  go on.
5        What was the comment that you understood Mr.
6  Frazier had shared with Gary Newton on Friday?
7    A.  That Bed Bath & Beyond was not the place for
8  him to work.
9    Q.  It's your understanding that Mr. Frazier had
10  told that to Mr. Newton, correct?
11    A.  Correct.
12    MR. GOLDSTEIN: Thank you.
13    I have no further questions.
14    MR. WILCK: I don't have any questions.
15    MR. ZATUCHNI: I just have a quick follow-up.
16  REDIRECT EXAMINATION BY MR. ZATUCHNI:
17    Q.  Going back to what you wrote there on May 8,
18  and May 11th, 2009.
19        So I, essentially, me, David Zatuchni, I
20  misread this.
21        You write, I told KF, based on his comment
22  that he shared with GN on Friday during his review,
23  that this wasn't the place for him. He's obviously not
24  happy with us.
25        You said that I misread that grammatically,

76

1  right?
2        So the comment you're saying -- this is a
3  comment -- the comment. "This wasn't the place for
4  him" was a comment that Frazier made on Friday, that's
5  what you were writing there?
6    A.  Yes.  It's a comment that Frazier made on May
7  8th during his performance appraisal.
8    Q.  I misread it.
9        And based on that comment, you're saying that
10  he's not happy with Bed Bath & Beyond, correct?
11    A.  Yes. I'm sorry.
12    MR. ZATUCHNI: Okay. I got it.
13    Thank you.
14    (Deposition of Paul DePrima concluded at 1:12
15  p.m.)
16
17
18
19
20
21
22
23
24
25

77

1        C E R T I F I C A T E
2
3        I, JACQUELINE MATHEWSON a Certified Court
4  Reporter, License Number XI01404, and Notary Public of
5  the State of New Jersey, do hereby certify that prior
6  to the commencement of the examination, PAUL DEPRIMA
7  was duly sworn by me to testify to the truth, the whole
8  truth and nothing but the truth.
9        I DO FURTHER CERTIFY that the foregoing is a
10  true and accurate transcript of the testimony as taken
11  stenographically by and before me at the time, place
12  and on the date hereinbefore set forth.
13        I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of any
15  of the parties to this action, and that I am neither a
16  relative nor employee of such attorney or counsel, and
17  that I am not financially interested in the action.
18
19
20
21  _____
22  Notary Public of the State of New Jersey
23  My Commission expires 3/18/2013
24  Dated: January 11, 2012
25

# Exhibit R

1             UNITED STATES DISTRICT COURT

2               DISTRICT OF NEW JERSEY

3           CIVIL ACTION NO.:  2:10-CV-5398

4  KEVIN FRAZIER,            :

5        Plaintiff,       :

6     -v-             :     CIVIL ACTION

7  BED BATH & BEYOND, BED BATH & :

8  BEYOND, INC. and GARY NEWTON, :

9       Defendants.      :

10  -----------------------------x

11     Computer-aided transcript of the Telephonic

12  deposition testimony of DAVID RUBIN taken

13  stenographically in the above-entitled matter before

14  JACQUELINE MATHEWSON, a Certified Court Reporter,

15  License No. XI01404, and Notary Public of the State of

16  New Jersey, at the Law Offices of PROSKAUER ROSE, LLP,

17  One Newark Center, Newark, New Jersey 07102 on Thursday,

18  December 15, 2011, commencing at 2:04 p.m.

19        GUY J. RENZI & ASSOCIATES

20    CERTIFIED COURT REPORTERS & VIDEOGRAPHERS

21       GOLDEN CREST CORPORATE CENTER

22     2277 STATE HIGHWAY #33, SUITE 410

23       TRENTON, NEW JERSEY 08690

24  TEL: (609) 989-9199  TOLL FREE: (800) 368-7652

25        www.renziassociates.com



## 2

```
 1   A P P E A R A N C E S:
 2   ZATUCHNI & ASSOCIATES, LLC
 3   BY:  DAVID ZATUCHNI, ESQ.
 4        287 South Main Street - Route 29
 5        Lambertville, New Jersey 08530
 6        Tel: (609) 243-0300
 7        E-mail: dzatuchniassociates.com
 8   Attorneys for the Plaintiff.
 9
10   PROSKAUER ROSE, LLP
11   BY:  MARVIN M. GOLDSTEIN, ESQ.
12        One Newark Center, 18th Floor
13        Newark, New Jersey 07102
14        Tel: (973) 274-3200
15        E-mail: mmgoldstein@proskauer.com
16   Attorneys for the Defendants Bed Bath
17   & Beyond and Gary Newton.
18
19   BED BATH & BEYOND
20   BY: MICHAEL H. WILCK, ESQ.
21        650 Liberty Avenue
22        Union, New Jersey 07063
23        Tel: (908) 688-0888
24        E-mail: michael.wilck@bedbath.com
25   Bed Bath & Beyond Corporate Attorney.
```

## 3

```
 1              I N D E X
 2
 3   WITNESS                      PAGE
 4   DAVID RUBIN
 5     Examination by Mr. Zatuchni      4
 6     Examination by Mr. Goldstein    21
 7
 8
 9          E X H I B I T S
10
11   ID       DESCRIPTION       PAGE
12
13        (NO EXHIBITS WERE MARKED.)
14
15
16          R E Q U E S T S
17
18     (NO FORMAL REQUESTS WERE MADE.)
19
20
21
22
23
24
25
```

## 4

```
 1   (Witness Telephonically.)
 2   D A V I D  R U B I N, 22317 Collington Drive, Bocca
 3   Raton, Florida; having been first duly sworn, testified
 4   as follows:
 5   DIRECT EXAMINATION BY MR. ZATUCHNI:
 6     Q.  Good afternoon, Mr. Rubin.
 7        For the record, again, this is David
 8   Zatuchni. I'm an attorney.  I represent a person named
 9   Kevin Frazier in a lawsuit that he has pending against
10   Bed Bath & Beyond.  And we're taking your deposition
11   today remotely as part of that lawsuit.
12        Just for the record, I'm sitting here in New
13   Jersey at the offices in Proskauer in Newark.
14        And you're where?  In Bocca Raton, Florida?
15   Mr. Rubin?  Are you there?
16     A.  Yes, I am.
17     Q.  Can you speak up a little bit or speak into
18   the microphone.
19        Have you ever had your deposition taken
20   before?
21     A.  I haven't.
22     Q.  I'll just be asking you factual questions.
23        Your obligation is simply to answer my
24   questions as truthfully and completely as you can.
25        If you don't understand one of my questions,
```

## 5

```
 1   please let me know and I'll rephrase my question, I'll
 2   restate it, I'll do whatever I need to do to make sure
 3   my meaning is clear to you. If you don't do that, we do
 4   assume for the record that you understood my question
 5   when you answered it.
 6        Do you understand that?
 7     A.  I do.
 8     Q.  Can you make sure that you keep your voice
 9   loud, please so the court reporter on this side can
10   hear what you're saying and record it properly.
11        If you need to take a break at any time,
12   please just let me know and we'll take a break.
13   Although, I don't think your deposition will take a
14   very long time.
15        Are you currently employed by Data Futures?
16     A.  Yes, I am.
17     Q.  How long have you been employed by Data
18   Futures?
19     A.  Thirteen years.
20     Q.  Are you like an officer --
21        What's your position within Data Future?
22     A.  CEO, President, Owner.
23     Q.  CEO, President and Owner. Okay.
24        Besides yourself, how many other employees
25   does Data Futures have?
```

**6**

1    A.   Two.
2    Q.   What are their names?
3    A.   Jose Minards and myself.
4    Q.   What is Data Futures in the business of?
5  What do you guys do?
6    A.   Database consulting.
7    Q.   You provide database consulting services to
8  Bed Bath & Beyond?
9    A.   Yes, we do.
10    Q.   For how long have you done that?
11    A.   To the best of my recollection, approximately
12  12 years.
13    Q.   What database services do you provide to Bed
14  Bath & Beyond?
15    A.   Maintenance, administration, programming,
16  on-call emergency support, general guidance.
17    Q.   Do you provide that with something called SQL
18  Server?
19    A.   We provide it for SQL Server and some of
20  those features for or Oracle.
21    Q.   Do you have a contract with Bed Bath &
22  Beyond?
23    A.   Yes.
24    Q.   Okay.
25        Have you had a contract since the very

**7**

1  beginning, since about 12 years ago?
2    A.   Yes.
3    Q.   How did you come about to first develop a
4  business relationship with Bed Bath & Beyond?  Just
5  explain to me the process of how they first came to
6  hire your company to provide the services?
7    A.   They contacted us, and we entered into a
8  contractual agreement to assist them and have done so
9  ever since.
10    Q.   Do you remember who it was that contacted you
11  from Bed Bath & Beyond?
12    A.   David Ortiz.
13    Q.   Did you know Mr. Ortiz prior to him
14  contacting you with respect to providing services to
15  Bed Bath & Beyond?
16    A.   No.
17    Q.   Do you know how he found you?
18    A.   To the best of my recollection, it was
19  word-of-mouth.
20    Q.   So you have known Mr. Ortiz for the last 12
21  years?
22    A.   Yes.
23    Q.   What's your understanding of who Mr. Ortiz is
24  or what his position is within Bed Bath & Beyond?
25    A.   He is -- and I'm not sure of his exact title,

**8**

1  but I know he is in charge of the Database Group at Bed
2  Bath & Beyond.
3    Q.   Was that his first position when he first
4  contacted you about hiring your company for database
5  administration services?
6    A.   I'm not sure.
7    Q.   Has he been the person who has negotiated the
8  contracts with you at Bed Bath & Beyond?
9    A.   He's been one of the people.
10    Q.   Who else have you negotiated these contracts?
11    A.   Everything.
12    Q.   Are these contracts annual or are they
13  renewed on a regular basis?
14    A.   It's automatic renewing at the end of each
15  yearly contract.
16    Q.   Do the rates change every year?
17    A.   The rates change according to how the client
18  requires them to be changed.
19    Q.   Does Data Futures have any other clients or
20  customers besides Bed Bath & Beyond?
21    A.   Yes, we do.
22    Q.   Just give me a general sense, let's say right
23  now, approximately what percentage of Data Futures'
24  revenue comes in Bed Bath & Beyond?
25    A.   I would guess 10 percent.

**9**

1    Q.   How about in the year 2009-2008, would that
2  be the same?
3    A.   2009-2008, I would have to look at the
4  records. I don't have it in front of me so I don't know
5  time frames for invoicing off the top of my head.
6    Q.   But you think that right about now it's 10
7  percent?
8    A.   Correct.
9    Q.   How long have you personally been located in
10  Bocca Raton, Florida?
11    A.   Nineteen years.
12    Q.   Have you ever worked out physically from the
13  Union, New Jersey location at the Bed Bath & Beyond?
14    A.   I've never been in Union, New Jersey at all.
15    Q.   Have you ever worked at any location for Bed
16  Bath & Beyond on site, so to speak?
17    A.   No, I haven't.
18    Q.   So you work remotely from Florida?
19    A.   Correct.
20    Q.   At some point in time --
21        Do you know who Kevin Frazier is?
22    A.   Yes, I did.
23    Q.   Have you ever met Kevin Mr. Frazier
24  personally?
25    A.   No.

10

1    Q.  At some point in time he was a database
2  administrator for Bed Bath & Beyond on the SQL Server,
3  correct?
4    A.  Correct.
5    Q.  During that period of time, how often would
6  you interact with him on a daily or weekly basis?
7    A.  I'd say on average one to two times per week.
8    Q.  Would that be by e-mail or by phone?
9    A.  Seventy-five percent by e-mail; twenty-five
10 percent by phone.
11   Q.  So you're saying that you would only talk to
12 him maybe once or twice a week on any given week?
13   A.  On average.
14   Q.  On average.
15      Can you give me a sense of the kind of
16 separation of the responsibilities that Data Futures
17 had with respect to the SQL Server, as opposed to Mr.
18 Frazier?
19   A.  I can't speak to any responsibilities that
20 Mr. Frazier had.  That would be between he and his
21 lawyer.  I can only discuss what my company does at Bed
22 Bath & Beyond.
23   Q.  Why don't you tell me what those
24 responsibilities were.
25   A.  As I said before, it was to provide 24/7

11

1  support, emergency support, programming,
2  administration, maintenance and general advice.
3    Q.  And at some point you sent an e-mail to Mr.
4  Frazier that had an imagine -- well, we refer to it as
5  the Ghetto SpongeBob e-mail.
6      Do you know what I'm referring to?
7    A.  Yes, I do.
8    Q.  At some point in November of 2008, did you
9  send that to Mr. Frazier?
10   A.  Accidentally.
11   Q.  Who was the intended recipient of that
12 e-mail?
13   A.  My sister-in-law.
14   Q.  How did you get that image?  I mean, how did
15 it come to you?
16      Did you create it?
17   A.  No.  I did not.
18   Q.  Do you remember how it came to you?
19   A.  It was forwarded to me through any one of
20 unrecollected friends who forward jokes and funny stuff
21 among ourselves.
22   Q.  And you were trying to send that to your
23 sister-- sister-in-law?
24   A.  Correct.
25   Q.  And it went to Mr. Kevin Frazier?

12

1    A.  Correct.
2    Q.  After sending the e-mail, what's the first
3  communication you had with anybody at Bed Bath & Beyond
4  regarding that e-mail?
5    A.  A response from Mr. Frazier stating LMAO with
6  two exclamation points.
7    Q.  Okay.
8      What's the next communication you had with
9  anybody from Bed Bath & Beyond regarding that e-mail?
10   A.  David Ortiz calling me directly informing me
11 that Mr. Frazier -- there was an issue, I can't
12 remember exactly, but there was an issue with regard to
13 that e-mail, and Kevin Mr. Frazier receiving it.
14   Q.  Do you recall approximately how much time
15 after you sent the e-mail and Mr. Frazier's getting the
16 e-mail that you spoke to Mr. Ortiz?
17   A.  To the best of my recollection, no more than
18 72 hours, most likely less.
19   Q.  So taking you through that conversation, what
20 did Mr. Ortiz tell you and what did you tell Mr. Ortiz?
21   A.  He mentioned Kevin receiving this e-mail.  I
22 apologized profusely.  I offered to fly up immediately
23 to Union, New Jersey and apologize in person to Mr.
24 Frazier.  He said that that was not necessary.  They are
25 handling this internally.  And just that it is to be

13

1  distinctly avoided sending any personal materials.
2    Q.  Did Mr. Ortiz suggest that you call Mr.
3  Frazier and apologize?
4    A.  He did not suggest that.
5    Q.  Did Mr. Ortiz suggest that you write to Mr.
6  Frazier, either by e-mail or some other way
7  apologizing?
8    A.  He did not suggest that.
9    Q.  Did you suggest that?  Either one of those
10 two options?
11   A.  I think when I offered to fly up or do
12 whatever is necessary to make sure the situation was
13 made good.  It was an accident.  I was profusely sorry.
14 It covered everything that they would have wanted me to
15 do.
16   Q.  What's the next communication that you had
17 from anybody also at Bed Bath & Beyond regarding that
18 e-mail?
19   A.  I believe some period later, Mr. Ortiz,
20 again, contacted me to reiterate their policy regarding
21 sending personal material.
22   Q.  Do you know when that was?
23   A.  Not exactly.
24   Q.  What's the text communication after that?
25      MR. GOLDSTEIN:  About the e-mails?

# Exhibit S

1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF NEW JERSEY

3                 CIVIL ACTION NO.:  2:10-CV-5398

4    KEVIN FRAZIER,                :

5            Plaintiff,            :

6          -v-                     :      CIVIL ACTION

7    BED BATH & BEYOND, BED BATH & :

8    BEYOND, INC. and GARY NEWTON, :        COPY

9            Defendants.          :

10   ----------------------------x

11       Computer-aided transcript of the deposition

12   testimony of ROBERT AQUILINO taken stenographically in

13   the above-entitled matter before JACQUELINE MATHEWSON,

14   a Certified Court Reporter, License No. XI01404, and

15   Notary Public of the State of New Jersey, at the

16   offices of PROSKAUER ROSE, LLP, One Newark Center,

17   Newark, New Jersey 07102 on Thursday, March 15, 2012,

18   commencing at 10:48 a.m.

19                GUY J. RENZI & ASSOCIATES

20        CERTIFIED COURT REPORTERS & VIDEOGRAPHERS

21            GOLDEN CREST CORPORATE CENTER

22          2277 STATE HIGHWAY #33, SUITE 410

23              TRENTON, NEW JERSEY 08690

24    TEL: (609) 989-9199  TOLL FREE: (800) 368-7652

25                www.renziassociates.com

**Page 2**

1  A P P E A R A N C E S :
2
3  ZATUCHNI & ASSOCIATES, LLC
4  BY:  DAVID ZATUCHNI, ESQ.
5      287 South Main Street - Route 29
6      Lambertville, New Jersey 08530
7      Tel: (609) 243-0300
8      E-mail: davidz@zatuchniassociates.com
9  Attorneys for the Plaintiff.
10
11
12  PROSKAUER ROSE, LLP
13  BY:  MARVIN M. GOLDSTEIN, ESQ.
14      One Newark Center, 18th Floor
15      Newark, New Jersey 07102
16      Tel: (973) 274-3200
17      E-mail: mmgoldstein@proskauer.com
18  Attorneys for the Defendants Bed Bath &
19  Beyond and Gary Newton.
20
21
22
23
24
25

**Page 4**

1              I N D E X
2
3  WITNESS                          PAGE
4  ROBERT AQUILINO
5      Direct Examination by Mr. Zatuchni    5, 37
6      Cross-Examination by Mr. Goldstein    35
7
8
9            E X H I B I T S
10
11  ID       DESCRIPTION         PAGE
12
13          (NO EXHIBITS WERE MARKED.)
14
15
16            R E Q U E S T S
17
18          (NO FORMAL REQUESTS WERE MADE.)
19
20
21
22
23
24
25

**Page 3**

1  A P P E A R A N C E S :
2
3  BED, BATH & BEYOND, IN-HOUSE COUNSEL
4  BY: MICHAEL H. WILCK, ESQ.
5      650 Liberty Avenue
6      Union, New Jersey 07063
7      Tel: (908) 688-0888
8      E-mail: michael.wilck@bedbath.com
9  In-house Counsel for Bed, Bath & Beyond.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1  R O B E R T  A Q U I L I N O, 267 Phillips Terrace,
2  Union, New Jersey 08872; having been duly sworn,
3  testified as follows:
4  DIRECT EXAMINATION BY MR. ZATUCHNI:
5  Q.  I'm sorry, what was your first name?
6  A.  Rob.
7  Q.  Rob.
8      What was your last name?
9  .A.  Aquilino.
10  Q.  Aquilino?
11  A.  Yes.
12  Q.  All right, Mr. Aquilino.
13      My name is David Zatuchni, I'm an attorney,
14  and I represent Kevin Frazier in a lawsuit that he has
15  pending against Bed, Bath & Beyond, and we're here to
16  take your deposition today as part of this lawsuit.
17      Have you ever been deposed before?
18  A.  I have not.
19  Q.  So a deposition is, essentially, just a
20  question and answer session. I'll be asking you
21  questions. Your obligation is simply to answer my
22  questions as truthfully an completely as you can.
23      Do you understand that?
24  A.  Yes.
25  Q.  You have been placed under oath by the court

18

1     Lisa DelRay.
2    A.  Right.
3    Q.  Do you know who that is?
4    A.  Yes.
5    Q.  Did she ever go to any of these dinners with
6  you guys at Steak On A Stone?
7    A.  No.
8    Q.  Did she participate in the paintball?
9    A.  She did not.
10    Q.  Did she participate in any of these holiday
11  dinners that you mentioned?
12    A.  No.
13    Q.  How many holiday dinners were there all
14  together?
15    A.  Just one.
16    Q.  Just one?
17    A.  Yes.
18    Q.  What holiday was that?
19    A.  Christmas, I think. You know, around then.
20    Q.  And she wasn't at that dinner either?
21    A.  No.
22    Q.  Where was that dinner held?
23    A.  Solar DiMingo.
24    Q.  Some kind of restaurant, I assume?
25    A.  Portuguese, yes.

19

1    Q.  Was Lisa DelRay at any of the these functions
2  when you were out with Mr. Frazier, any of these nights
3  out that you can recall?
4    A.  Not that I recall, no.
5    Q.  Let's go to within the work place.
6    You said that you ate lunch with Mr. Frazier
7  like two or three times a week?
8    A.  Yes.
9    Q.  Where did you mostly eat lunch?
10    A.  It varied, but mostly Sushi.
11    Q.  So you went out?
12    A.  Out.
13    Q.  Was there a cafeteria within the facility
14  itself?
15    A.  Yes.
16    Q.  How often would you eat at the cafeteria?
17    A.  Probably never.
18    Q.  How about Mr. Frazier, did he generally eat
19  at the cafeteria?
20    A.  Not that I recall.
21    Q.  You don't recall Mr. Frazier going down and
22  eating at the luncheonette?
23    A.  No.
24    Q.  Was there like a group that would generally
25  go out to lunch together with you and Mr. Frazier?

20

1    A.  The group would be, you know, Kevin and
2  myself, and whoever didn't have lunch that day and felt
3  like going, and that would vary from time to time.
4    Q.  So you one of Mr. Frazier's better friends in
5  the workplace?
6    A.  I'd like to believe that, yes.
7    Q.  Have you been in touch with him since he left
8  Bed, Bath & Beyond?
9    A.  Through like e-mail, but not so much -- an
10  e-mail linked in type thing.
11    Q.  Did Lisa DelRay go out to lunch with you and
12  Kevin?
13    A.  Yes.
14    Q.  How often would she go to lunch with you
15  guys?
16    A.  Approximately once every other week,
17  something like that.
18    Q.  If Mr. Frazier wasn't going out to lunch with
19  you, you said you went to lunch with him three or four
20  times a week?
21    A.  Right.
22    Q.  Do you know what else he'd been doing for
23  lunch?
24    A.  Probably going out with other folks.
25    Q.  Were Lisa DelRay and Mr. Frazier particularly

21

1  friendly?
2    A.  I believe so, yes.
3    Q.  What's your understanding of what their
4  relationship was like?
5    A.  Friendly, like Kevin and myself.
6    Q.  Did you ever get any e-mails from Lisa DelRay
7  that depicted images of African Americans?
8    A.  No.
9    Q.  Did you ever see any e-mails from Lisa DelRay
10  that you thought might be considered offensive
11  racially?
12    A.  No.
13    Q.  What race are you, by the way, just for the
14  record?
15    A.  White.
16    Q.  Just White?
17    A.  Yes.
18    Q.  Are you Latino, Hispanic?
19    A.  Italian.
20    Q.  At any point in time did Mr. Frazier tell you
21  that he received any e-mails that he found to be
22  racially offensive?
23    A.  Yes. Yes.
24    Q.  Do you remember approximately when that was?
25    A.  I don't.

30

1  just give me the approximate date when you were
2  contacted by Mr. Wilcks.
3      MR. GOLDSTEIN: It's Wilck.
4      MR. WILCK: W-i-l-c-k.
5      A.  I know it was after I spoke with Paul.
6      Q.  Was it a week after or two weeks or three
7  weeks or like last week just before this deposition?
8      A.  I don't recall. I'm sorry. I just --
9      Q.  Did you talk to somebody in preparation for
10  this deposition today?
11      A.  I spoke with Paul, and I forgot his name.
12      MR. GOLDSTEIN: Somebody from my office. Matt
13  Bedastein.
14      A.  I don't recall his name.
15      Q.  That's all right.
16          When was that conversation?
17      A.  I think it was earlier in the week.
18      Q.  Where did that conversation --
19          Again, don't tell me what was said, just
20  where that conversation took place.
21      A.  Bed, Bath & Beyond.
22      Q.  Present at that conversation was another
23  gentleman, Mr. Goldstein, Mr. Somebody and Mr. Wilck?
24      A.  Mr. Wilck.
25      Q.  Was anybody else present at that

31

1  conversation?
2      A.  No.
3      Q.  Did you observe any interaction between Mr.
4  Frazier or any of his managers or supervisors, let's
5  say, in the last week of his employment?
6      A.  No.
7      Q.  Did you ever witness Mr. Frazier acting
8  inappropriately in any way?
9      A.  No.
10      Q.  Did you ever see him --
11          Did you ever witness any kind of interaction
12  where he was having an argument or raised his voice,
13  was having some type of altercation with one of his
14  managers or supervisors?
15      A.  No.
16      Q.  How about with Mr. DePrima?
17      A.  No.
18      Q.  How about with anybody?
19      A.  Not that I can recall.
20      Q.  Okay.
21          Were you present on the day that Mr. Frazier
22  was terminated, his last day of work?
23      A.  I was at work that day.
24      Q.  Did you witness any interaction that Mr.
25  Frazier had coming out of a performance review that

32

1  day?
2      A.  No.
3      Q.  How about in the preceding two days?
4      A.  No.
5      Q.  Do you know why you've been named as a
6  witness in this case?
7      A.  No.
8      Q.  Let's take a couple minute break.
9      A.  Okay. Yes.
10          (Pause in proceeding.)
11  BY MR. ZATUCHNI:
12      Q.  Going back to Ms. DelRay.
13          Did you ever socialize with her outside of
14  the workplace?
15      A.  Lunchtime.
16      Q.  Lunchtime?
17      A.  Yes.
18      Q.  I guess what I mean is, did you ever go out
19  to dinner with her just alone, were you ever
20  particularly friendly with her outside of the
21  workplace?
22      A.  No.
23      Q.  Were you ever at her house?
24      A.  No.
25      Q.  Was she ever at your house?

33

1      A.  No.
2      Q.  Did she ever discuss Mr. Frazier with you in
3  any particular way?
4      A.  No.
5      Q.  You mentioned Ms. DelRay would go out to
6  Sushi with you and Mr. Frazier let's say once every
7  other week?
8      A.  Approximately, yes.
9      Q.  Were there times where a group of -- Mr.
10  Frazier or anybody else went on group walks around the
11  facility?
12      A.  Yes.
13      Q.  Tell me, was that organized by Mr. Frazier?
14      A.  I don't recall who organized it.
15      Q.  How often did such walks take place?
16      A.  Approximately --
17          In the beginning, approximately three, four
18  times a week; once a day.
19      Q.  And so how long were the walks?
20      A.  Approximately 15 minutes, 18 minutes,
21  something like that.
22      Q.  Was there a decrease in the number of walks
23  per week as time went on?
24      A.  There was.
25      Q.  Who participated in these walks?

# Exhibit T

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

CIVIL ACTION NO.:  2:10-CV-5398

KEVIN FRAZIER,                    :

          Plaintiff,             :

     -v-                          :        CIVIL ACTION

BED BATH & BEYOND, BED BATH & :

BEYOND, INC. and GARY NEWTON, :

          Defendants.            :

-----------------------------x

     Computer-aided transcript of the deposition

testimony of NOREN SHAH taken stenographically in the

above-entitled matter before JACQUELINE MATHEWSON, a

Certified Court Reporter, License No. XI01404, and

Notary Public of the State of New Jersey, at the

offices of PROSKAUER ROSE, LLP, One Newark Center,

Newark, New Jersey 07102 on Thursday, March 15, 2011,

commencing at 11:37 a.m.

GUY J. RENZI & ASSOCIATES

CERTIFIED COURT REPORTERS & VIDEOGRAPHERS

GOLDEN CREST CORPORATE CENTER

2277 STATE HIGHWAY #33, SUITE 410

TRENTON, NEW JERSEY 08690

TEL: (609) 989-9199   TOLL FREE: (800) 368-7652

www.renziassociates.com

**Page 2**

APPEARANCES:

ZATUCHNI & ASSOCIATES, LLC
BY: DAVID ZATUCHNI, ESQ.
   287 South Main Street - Route 29
   Lambertville, New Jersey 08530
   Tel: (609) 243-0300
   E-mail: davidz@zatuchniassociates.com
Attorneys for the Plaintiff.

PROSKAUER ROSE, LLP
BY: MARVIN M. GOLDSTEIN, ESQ.
   One Newark Center, 18th Floor
   Newark, New Jersey 07102
   Tel: (973) 274-3200
   E-mail: mmgoldstein@proskauer.com
Attorneys for the Defendants Bed Bath &
Beyond and Gary Newton.

**Page 3**

APPEARANCES:

BED, BATH & BEYOND, IN-HOUSE COUNSEL
BY: MICHAEL H. WILCK, ESQ.
   650 Liberty Avenue
   Union, New Jersey 07063
   Tel: (908) 688-0888
   E-mail: michael.wilck@bedbath.com
In-house Counsel for Bed, Bath & Beyond.

**Page 4**

INDEX

WITNESS                              PAGE
NOREN SHAH
   Examination by Mr. Zatuchni        5, 23
   Examination by Mr. Goldstein       21

EXHIBITS

ID        DESCRIPTION        PAGE

(NO EXHIBITS WERE MARKED.)

REQUESTS

(NO FORMAL REQUESTS WERE MADE.)

**Page 5**

NOREN SHAH, 10 Skurka Court, Sayreville, New Jersey 08872; having been first duly sworn and testified as follows:

DIRECT EXAMINATION BY MR. ZATUCHNI:

Q. Good morning, Mr. Shah.
   My name is David Zatuchni. For the record, I'm an attorney. I represent Kevin Frazier in a lawsuit that he's brought against Bed, Bath & Beyond, and we're here taking your deposition today as part of that lawsuit.
   Have you ever had your deposition taken before?
A. No.
Q. So I'll just give you some ground instructions.
   A deposition is a question and answer session. I will be asking you some factual questions and your obligation is to answer my questions as truthfully as you can. Do you understand that?
A. Uh-huh.
Q. Please make sure all of your answers are verbal. Nods, shrugs, uh-hums, things like that cannot be recorded by the court reporter. So just speak all of your answers, and keep your voice up so that she can hear you. Do you understand that?

**10**

1    A.  Two to the left, one behind.
2    Q.  So how far away would that be approximately
3  in terms of feet?
4        MR. GOLDSTEIN: As the crow flies?
5        MR. ZATUCHNI: As the crow flies, yes.
6    A.  I would say between 10 and 15 feet.
7    Q.  Did you interact with Mr. Frazier
8  professionally in terms of your work responsibilities?
9    A.  No.
10    Q.  Did you interact with him socially?
11        Would you go out to lunch together, things of
12  that nature?
13    A.  No. We never went to lunch together.
14    Q.  Did you interact with him socially within IT
15  West; would you chat, talk?
16    A.  No. But just like if you're just walking down
17  the hallway, you see somebody and say good morning or
18  hello, that type.
19    Q.  That's the extent of your interaction?
20    A.  That's the extent.
21    Q.  Did you ever attend any functions or events
22  outside the workplace with Mr. Frazier?
23    A.  No.
24    Q.  Did you ever observe Mr. Frazier's, any of
25  his interactions with his bosses, his supervisors or

**11**

1  his managers?
2    A.  No.
3    Q.  Did you ever observe or witness any type of
4  altercation or argument that Mr. Frazier was having
5  with someone in the workplace?
6    A.  No.
7    Q.  Were you present the day that he was
8  terminated?
9    A.  I worked that day.
10    Q.  Did you witness any interaction between Mr.
11  Frazier and any boss or supervisor or manager that
12  particular day?
13    A.  No.
14    Q.  How about the week before that?
15    A.  No.
16    Q.  Did you ever witness Mr. Frazier acting
17  inappropriately in any way in the workplace?
18    A.  Yes. That particular day. The next day I
19  found out that he was terminated the day before.
20        That particular day he -- I did notice that.
21    Q.  So you're saying the day that he was
22  terminated you witnessed something?
23    A.  Correct.
24    Q.  Okay.
25        What did you observe that day?

**12**

1    A.  Just that, you know, someone was really loud.
2  And I was kind of surprised with the commotion or
3  whatever. And I got up from my cube and I noticed him
4  standing, and, you know --
5        Whatever he was saying, I could not catch
6  because I got off guard because I was working at the
7  time.
8    Q.  Who was he talking to?
9    A.  He was just by himself. He was loud.
10    Q.  He was loud to himself?
11    A.  He was loud standing in his cube looking
12  towards the direction, and he was just saying --
13    Q.  Was he talking to himself or talking to
14  anybody else?
15    A.  He wasn't talking to himself, but he was
16  screaming loud, a loud voice, and there were a few
17  structured sentences.
18    Q.  Could you see who he was talking to?
19    A.  Nobody was standing.
20    Q.  Did you think that he was addressing somebody
21  that was out of your line of vision?
22    A.  Correct.
23    Q.  Do you have any idea who that person was?
24    A.  At that time, no.
25    Q.  At some subsequent time did you learn who

**13**

1  that person was?
2    A.  I'm sorry.
3    Q.  At some subsequent time did you learn who
4  that person was that he was talking to?
5    A.  Yes.
6    Q.  What's your understanding now as you sit here
7  of who he was talking to?
8    A.  From the next day when we found out about his
9  termination, it seemed like the direction he was
10  looking as he was standing up in the cube and was loud,
11  was the direction where his manager's cube is.
12    Q.  Where his manager's cube is?
13    A.  Yes.
14    Q.  Who was his manager?
15    A.  Gary Newton.
16    Q.  Gary Newton?
17        Did somebody tell you --
18        Do you know for a fact he was talking to Gary
19  Newton?
20    A.  Nobody told me.
21    Q.  You're just saying that the next day he was
22  terminated and your impression at that point in time
23  was that when you saw him the previous day, he was
24  facing Gary Newton's cube?
25    A.  Correct.

# Exhibit U

EEOC FORM 131 (11/09)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Ms. Priscilla Osteria<br>Human Resource Generalist<br>FUSIONSTORM<br>2 Bryant Street<br>Suite 150<br>San Francisco, CA 94105 | **Kevin W. Frazier** |

| THIS PERSON (check one or both) |
|---|
| [X] Claims To Be Aggrieved |
| [ ] Is Filing on Behalf of Other(s) |

EEOC CHARGE NO.
**524-2011-00257**

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[ ] Title VII of the Civil Rights Act (Title VII)    [ ] The Equal Pay Act (EPA)    [X] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA)    [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [X] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [ ] Please provide by _____ a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by _____ to _____
   If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| John Douglass<br>CR/TIU Supervisor | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004<br>Fax: (212) 336-3625 |
|---|---|
| *EEOC Representative* | |
| *Telephone* **(212) 336-3620** | |

Enclosure(s): [ ] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[ ] Race  [ ] Color  [ ] Sex  [ ] Religion  [ ] National Origin  [ ] Age  [X] Disability  [X] Retaliation  [ ] Genetic Information  [ ] Other

**ISSUES: Benefits    Unperfected charge received on  1/19/11-FORMAL CHARGE WILL FOLLOW AT A LATER DATE**

DATE(S) (on or about):  EARLIEST:  08-05-2010    LATEST:  10-30-2010

| Date<br><br>**January 25, 2011** | Name / Title of Authorized Official<br><br>**Corrado Gigante,<br>Director** | Signature |
|---|---|---|

000002

*Enclosure with EEOC*
*Form 131 (11/09)*

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14  Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 207(f) of GINA, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

000003

# Exhibit V

NAME REDACTED OF PERSON PRINTING EMAIL

**From:**      Kevi32@aol.com
**Sent:**      Monday, August 24, 2009 11:59 AM
**To:**        tristatenancrisis@verision.net
**Subject:**   Fwd: Emails sent from co-worker Kevin Frazier

)

i have all the documents and certified reports from EEOC.  I have copies of everything.

The first email is a co-worker (David J Rubin) we work  in the same department.  However he works out of FL, he is the brother of the Director of IT who gets to work from his home in Florida.  I interact with him more than the other co-worker.  **He is a White male.  He still works for Bed Bath & Beyond**

The second email is a co-worker (Lisa) who works from the same office in Union New Jersey.  However she works in a different department.  **She is White and Mexican Mixed.  She still works for Bed Bath & Beyond**

**If the emails had came from another African American I would still have been upset with the emails.  As they are horrible to view.  ALL my reviews are rated Above  and I have never been written up for anything at all.  I have copies of all my reviews too.**

Kevin Frazier

201 430 9028

1.  EEOC is still in the process of  investigating, I am told they have so many cases it can take years to finish up an investigation.

Forwarded by Kevin Frazier/IT/Corporate/BBBY on 11/05/2008 07:57 AM ——

**"David J Rubin" <djrubin@data-futures.com>**          To  Kevin Frazier IT/Corporate/BBBY@BBBY

11/04/2008 02:33 PM                                     cc

                                                       Subject FW: Ghetto SpongeBob

    Please respond to

1

\<djrubin@data-futures.com\>

Ghetto SpongeBob found in

New Orleans

**DEAD**



**NiGGA**

Forwarded by Kevin Frazier/IT/Corporate/BBBY on 04/09/2009 11:31 AM ——

**Kevin Frazier/IT/Corporate/BBBY**                    To kevin32@aol.com

04/09/2009 11:29 AM                                         cc

                                                                    Subject Fw: WHY- WHY- WHY!!!!

email from employee

Thank You,
Kevin Frazier, MCP #2767182
Bed Bath & Beyond
Database Administration
Office: 1-908-855-4740
Kevin.Frazier@bedbath.com
—— Forwarded by Kevin Frazier/IT/Corporate/BBBY on 04/09/2009 11:30 AM ——

Lisa Del Rey/IT/Corporate/BBBY

08/11/2008 02:54 PM

To acote@ioncomputer.com, sandysal876@aol.com, juliav@qualcomm.com,
kristen.wardlow@libertymutual.com, Kevin Frazier/IT/Corporate/BBBY@BBBY

cc

Subject WHY- WHY- WHY!!!!

# YOUR FOLKS GOTTA BE SO GHETTO????



WHYYYYYYYYYYYYYYYYYYYY!!!!

3



**I WOULDN'T BE CAUGHT DEAD IN THIS!!!!!!!**



**LOUIS VUTTON'S HOOPTY!!!**

4



FRAZIER/GSM 005

-----Original Message-----
From: kevin frazier [mailto:kevi32@aol.com]
Sent: Friday, August 21, 2009 1:51 AM
To: shameshameshame@fox5ny.com
Subject: Shame Tip (kevin frazier)

Name: kevin frazier

Email Address: kevi32@aol.com

Phone number 201 430 9028

I am sending this letter hopping that It
will get to the right person who might be able to present my experience
to the Media.   So that others will not have to go through this.


Kevin Frazier

Phone number:  201 430 9028 or 201 680 9505

Email:  Kevi32@aol.com

Address:  224 Roosevelt street apt 1 union city, NJ 07087



I am a 43 year old African American Male who was working for Bed Bath &
Beyond Corporate Office in Union New Jersey for 2 years in the IT
department.  I have been doing IT work for 14 years, and I am Certified
in my filed of work.

The first year working for the company I had no problems.  During my
second year, I received Some Racial jokes toward African Americans in
emails from other co-works. Some that displayed Dead African American
from 'Hurricane Katrina', others displayed drunk (empty bottles of
Alchol)  African American Males with watermelons (a black stereotype)
around him.  In one email there a total of 13 photos with negative
captions towards the African American race.  When I reported the emails
to my manager, I was told that I was a troublemaker.  I then reported
the emails to our Human Resource manager.  The fact that the emails
proved to be from co-workers did not seem to be important to my manager.
This made me feel bad, and I then reported the problem to my local
E.E.O.C.  After reporting the complaints to EEOC, my manager made my
life a living hell, by treating me very unfair.

6

Examples of unfair treatment:

*     Yelling and cursing at me in meetings.

*     Calling me the 'N' word and thinking it was funny

*     Making me work longer hours than other co-workers

*     Asking me to train co-worker to do my job, one who sent the
racial email reported

I was fired and was told the reason I was fired was because 'I filed a
complaint with EEOC'.  However the company refused to put this in
writing.  When applying for unemployment BedBath &Beyond reported the
reason I was fired was 'misconduct'.  When I reported this was not the
reason I was fired, I had to be interviewed by the state of New Jersey.
During the interview 'Bed Bath & Beyond' changed the reason to 'No
reason given'.   I was later rewarded my unemployment claim.


It has been 6 months, the co-workers who sent me the email still work
and BedBath &Beyond.  I am now having problems trying to get a new job,
because Bed Bath & Beyond refuse to give any companies' reference, or
dates of employment.  My life seems like a living hell, as I am slowing
losing all I own.  It's very hard to go through something like this, and
try to get your life back on track.  However, I have faith that 'GOD'
will help me out of this mess.


I have over 14 years experience in my line of work, but when trying to
get reference or dates of employment from Bed Bath & Beyond they will
not give other companies my work information.   In fact one prospect
Employment Company talked to my manger, who stated that I treated him,
and that was why I was fired.


If I had to do it all again, I would never say reported this because I
would never want to go through slowing losing everything I own, and not
being able to keep up with my bills.


Kevin Frazier

201 430 9028

Email: kevi32@aol.com


-

# Exhibit W

| Gary Newton/IT/Corporate/BBBY | To | Paul DePrima/HR/Corporate/BBBY@BBBY |
|---|---|---|
| | cc | |
| 09/24/2009 08:25 AM | bcc | |
| | Subject | Fw: question on Call Schedule |

Paul,

Please see the below email chain.

Gary J. Newton
Bed Bath & Beyond
Database Administration Manager
Office: 1-908-688-0888 x4755
gary.newton@bedbath.com

----- Forwarded by Gary Newton/IT/Corporate/BBBY on 09/24/2009 08:24 AM -----

| Gary Newton/IT/Corporate/BBBY | To | Paul DePrima/HR/Corporate/BBBY |
|---|---|---|
| 09/08/2009 04:19 PM | cc | David A Ortiz/IT/Corporate/BBBY@BBBY |
| | Subject | Fw: question on Call Schedule |

Paul,

Attached is the requested email chain regarding Kevin Frazier being requested to perform the primary SQL Server DBA support role on a going forward basis.

The initial meeting with Kevin was on 12/16/2008. Please read the chain of email to see the questions and responses.

Thanks

Gary J. Newton
Bed Bath & Beyond
Database Administration Manager
Office: 1-908-688-0888 x4755
gary.newton@bedbath.com

----- Forwarded by Gary Newton/IT/Corporate/BBBY on 09/08/2009 04:13 PM -----

| Gary Newton/IT/Corporate/BBBY | To | Kevin Frazier/IT/Corporate/BBBY@BBBY |
|---|---|---|
| 12/18/2008 10:59 AM | cc | |
| | Subject | Re: question on Call Schedule |

Kevin,

There is a difference than before.

Before, Data Futures was being used as primary after hours support every other month. They will not be primary support anymore. You will be the primary support, but if for some reason I can not immediately reach you I may need to a call them and have them start working on the issue until you can call back.

Of course they will be primary when you are on vacation, sick, etc., that does not change.

Gary J. Newton
Bed Bath & Beyond
Database Administration Manager
Office: 1-908-688-0888 x4755
gary.newton@bedbath.com

Kevin Frazier/IT/Corporate/BBBY



|   | Kevin Frazier/IT/Corporate/BBBY 12/18/2008 10:46 AM | To | Gary Newton/IT/Corporate/BBBY@BBBY |
|---|---|---|---|
|   |   | cc |   |
|   |   | Subject | Re: question on Call Schedule |

As always,   I have always respond with accurate determination and resolution.  If you disagree please give me an example of a time you felt I did not.

I do not think there was ever a time when you or anyone has called me, and left me a message, and I not call them back.   Evan when I am not on call, I still answer the phone, and help out with issues as I have been in the past 2 years.

My concern was in our meeting I though, you are going to cut back on use of D.F support.    However it now sounds like we can still use them as we did last Friday.


Thank You,
Kevin Frazier. MCP #2767182
Bed Bath & Beyond
Database Administration
Office: 1-908-855-4740
Kevin.Frazier@bedbath.com
Gary Newton/IT/Corporate/BBBY

|   | Gary Newton/IT/Corporate/BBBY 12/18/2008 10:09 AM | To | Kevin Frazier/IT/Corporate/BBBY@BBBY |
|---|---|---|---|
|   |   | cc |   |
|   |   | Subject | Re: question on Call Schedule |


Kevin,

There is going to be the occasional time that you can not immediately respond. You might be at church, at the dentist, or something else. If I can not get you I will call Data Futures. But we would expect that you would call back as soon as possible. Your knowledge of the systems is very important to a fast and

accurate determination and resolution of the issue. It was demonstrated with this past Friday's Customer1 prod issue. When you reviewed the analysis performed by Data Futures, you did not agree and continued to try to find a root cause.

But to be clear, you are our primary support, not Data Futures, going forward. You are expected to carry your phone and have your laptop available if the need arises. As a rule you will be our first contact, with the expectation that if we can not immediately reach you, you will call back asap. It does not mean the next day or after the weekend, but as soon as you reasonable can. Depending on the issue I may have engaged Data Futures, but you would then pick up the support of that issue.

Gary J. Newton
Bed Bath & Beyond
Database Administration Manager
Office: 1-908-688-0888 x4755
gary.newton@bedbath.com

Kevin Frazier/IT/Corporate/BBBY



| | Kevin Frazier/IT/Corporate/BBBY<br>12/17/2008 03:48 PM | To | Gary Newton/IT/Corporate/BBBY@BBBY |
| | | cc | |
| | | Subject | Re: question on Call Schedule |

I can not guarantee that I will always be available every single day after work hours & weekends. I need to have time where I do not have to worry about work on weekends and after hours. That being said, as of now where I am on a rotating on-call schedule, there are times I might not be able to answer the phone, yet if someone leaves a message I always call them back.

Thank You,
Kevin Frazier. MCP #2767182
Bed Bath & Beyond
Database Administration
Office: 1-908-855-4740
Kevin.Frazier@bedbath.com
Gary Newton/IT/Corporate/BBBY

| | Gary Newton/IT/Corporate/BBBY<br>12/17/2008 10:44 AM | To | Kevin Frazier/IT/Corporate/BBBY@BBBY |
| | | cc | |
| | | Subject | Re: question on Call Schedule |

Kevin,

Dave gave the OK for a wireless card for your laptop. The On-Call schedule is as we spoke about but I also mentioned that we can still use Data Futures when you are on vacation. This also includes when you

BBB/F 000688

are sick, working another production issue, or unavailable such as in class, family emergency, etc.

Gary J. Newton
Bed Bath & Beyond
Database Administration Manager
Office: 1-908-688-0888 x4755
gary.newton@bedbath.com

Kevin Frazier/IT/Corporate/BBBY



| | Kevin Frazier/IT/Corporate/BBBY | To | Gary Newton/IT/Corporate/BBBY@BBBY |
|---|---|---|---|
| | 12/16/2008 04:59 PM | cc | |
| | | Subject | question on Call Schedule |

Is it possible to get what is expected for On-Call schedule for me in writing?    Just want to make sure I understand what will be expected for 2009, per out conversation today.

Thank You,
Kevin Frazier. MCP #2767182
Bed Bath & Beyond
Database Administration
Office: 1-908-855-4740
Kevin.Frazier@bedbath.com

BBB/F 000689

# Exhibit X



Kevin
Frazier/IT/Corporate/BBBY
04/09/2009 11:36 AM

To    davidz@zatuchniassociates.com
cc
bcc
Subject   Fw: Ghetto SpongeBob

----- Forwarded by Kevin Frazier/IT/Corporate/BBBY on 04/09/2009 11:36 AM -----



Kevin
Frazier/IT/Corporate/BBBY
04/09/2009 11:29 AM

To    kevi32@aol.com
cc
Subject   Fw: Ghetto SpongeBob

email from contractor

----- Forwarded by Kevin Frazier/IT/Corporate/BBBY on 04/09/2009 11:29 AM -----



"David J Rubin"
<djrubin@data-futures.com>
11/04/2008 02:33 PM

Please respond to
<djrubin@data-futures.com>

To    "David J Rubin" <djrubin@data-futures.com>
cc
Subject   FW: Ghetto SpongeBob

Ghetto SpongeBob found in
New Orleans



BBB/F 000748

# Exhibit Y



Kevin
Frazier/IT/Corporate/BBBY
08/11/2008 02:57 PM

To   Lisa Del Rey/IT/Corporate/BBBY@BBBY

cc

bcc

Subject   Re: WHY- WHY- WHY!!!!

I saw this one before, it's crazy but i am sure it can not be true.   I never saw anything like this... well maybe at a prom....

Thank You,
Kevin Frazier
Bed Bath & Beyond
Database Administration
Office: 1-908-688-0888 x4740
Kevin.Frazier@bedbath.com

BBB/F 000860

# Exhibit Z

 **Kevin Frazier/IT/Corporate/BBBY**

08/11/2008 03:00 PM

To   Lisa Del Rey/IT/Corporate/BBBY@BBBY

cc

bcc

Subject   Re: WHY- WHY- WHY!!!!

well just around area of NJ around prom time you see allot of crazy stuff like this, but this looked like old people from the south some place.    the funny one was uncle peaches..\aunt bob

Thank You,
Kevin Frazier
Bed Bath & Beyond
Database Administration
Office: 1-908-688-0888 x4740
Kevin.Frazier@bedbath.com

# Exhibit AA



**Kevin
Frazier/IT/Corporate/BBBY**
11/04/2008 02:41 PM

To  <djrubin@data-futures.com>
cc  "David J Rubin" <djrubin@data-futures.com>
bcc
Subject  Re: FW: Ghetto SpongeBob

lmao!!!

Thank You,
Kevin Frazier. MCP #2767182
Bed Bath & Beyond
Database Administration
Office: 1-908-688-0888 x4740
Kevin.Frazier@bedbath.com
"David J Rubin" <djrubin@data-futures.com>



**"David J Rubin"
<djrubin@data-futures.com>**
11/04/2008 02:33 PM

| Please respond to
<djrubin@data-futures.com> |

To  "David J Rubin" <djrubin@data-futures.com>
cc
Subject  FW: Ghetto SpongeBob

Ghetto SpongeBob found in

New Orleans



BBB/F 000857

# Exhibit BB

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

KEVIN FRAZIER,

           Plaintiff,

     v.

BED BATH AND BEYOND INC. and GARY
NEWTON, in his individual and professional
capacities,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No.: 10-CV-5398
(WJM)(MAS)

DECLARATION OF
MICHAEL H. WILCK

I, **MICHAEL H. WILCK**, of full age, hereby declare as follows:

1.     I am an Attorney-at-Law of the State of New Jersey and am employed as in-house counsel to Bed Bath & Beyond Inc. ("BBB"). In that capacity, I am fully familiar with the facts of the above matter. I submit this Declaration in opposition to Plaintiff Kevin Frazier's ("Frazier") Motion To Preclude Use of Certain Late Produced Documents.

2.     The complaint in the above matter was filed on October 20, 2010. In November 2010, shortly after BBB was served with the Complaint, I requested and obtained various email files. These email files included (i) Frazier's email account as it existed on May 17, 2009 (several days after his termination), and (ii) Ms. Del Rey's email account as it existed on May 12, 2009 (the day after Frazier was terminated). David Rubin is not an employee of BBB and thus BBB does not have control of his email file. I turned over these email files to BBB's outside counsel, Proskauer Rose LLP.

3.     Frazier's email replies to Del Rey's allegedly "highly offensive" email -- which stated that Frazier had seen the email before, and that he found at least one of the images to be funny -- do not exist in either of these email files. Likewise, Frazier's email reply to David

Rubin's allegedly "callous and racially insensitive" email, in which he stated "LMAO!!!", did not exist in Frazier's email file.

4.      On or about December 9, 2011, I was informed by BBB's outside counsel, Proskauer Rose LLP, that during their conversation with David Rubin in advance of his December 15, 2011 deposition, Mr. Rubin stated his recollection that shortly after he mistakenly sent Frazier the allegedly offensive email, Frazier replied indicating that he thought the email was funny. No such reply, however, existed in Frazier's email file.

5.      In light of this information, and because Frazier's email file would not reflect emails which he had deleted, on December 13, 2011, I obtained from BBB's backup email server a restored image of Frazier's email file as it existed on November 4, 2008, the date of the David Rubin email. My search of that restored file revealed Frazier's response to the Rubin email, which BBB produced to Mr. Zatuchni on December 14, 2011. Proskauer's subsequent review of that email file revealed Frazier's replies to the Del Rey email, which were produced to Mr. Zatuchni on January 5, 2012.

6.      Based on the above, it is clear that Frazier deleted the emails in question sometime between November 4, 2008 and May 17, 2009. BBB's delay in finding and producing those emails was caused by Frazier deleting the emails from his email file.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Michael H. Wilck

Dated: February 27, 2012

2